**MODIFY and AFFIRM; and Opinion Filed December 16, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01194-CR

### KELLIE LYNN DOMINY-GATZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 15th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 065333**

## MEMORANDUM OPINION

Before Justices Fillmore, Brown, and O'Neill[1]
Opinion by Justice Fillmore

In three points of error, appellant Kellie Lynn Dominy-Gatz asserts the trial court erred in denying her motion to suppress all evidence resulting from an illegal search of her vehicle and in denying her motion to suppress statements she made to a law enforcement officer, and the evidence was insufficient to support her conviction for possession with intent to deliver methamphetamine. As modified, we affirm the trial court's judgment.

**Procedural Background**

Dominy-Gatz was charged with possession with intent to deliver methamphetamine in an amount of four grams or more but less than 200 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(d) (West 2010). The jury found Dominy-Gatz guilty of possession with intent to

---

[1] The Honorable Michael J. O'Neill, Justice, Assigned.

deliver methamphetamine in an amount of more than four grams but less than two hundred grams as charged in the indictment.[2] Dominy-Gatz pleaded true to the enhancement paragraph of the indictment. The trial court found the enhancement paragraph true and assessed punishment of twenty years' confinement. Dominy-Gatz filed this appeal of her conviction.

## Evidence at the Guilt-Innocence Phase of Trial

### *Jeremy Monroe's Testimony*

During the guilt-innocence phase of trial, the jury heard the testimony of Denison, Texas, police officer Jeremy Monroe. At approximately 1:15 a.m. on December 10, 2014, Monroe was patrolling the streets of Denison. At that time, Monroe was following a vehicle driven by Daniel Pena and occupied by four males. Monroe had previously encountered Pena and was aware that Pena was known to sell and distribute methamphetamine. Monroe followed Pena's vehicle to a Denison bar with a bad reputation. Monroe previously had been dispatched to that bar on a number of occasions. Pena went into the bar for only eight to ten minutes, a visit Monroe found suspiciously short in duration. Pena then proceeded to a residence and dropped off two individuals who had been in his vehicle.

From the residence, Pena drove to the parking lot of a WalMart store. Monroe, who had exited his police cruiser behind an adjacent building to avoid being seen by Pena, surveilled the WalMart parking lot using binoculars. As soon as Pena parked, a four-door silver passenger car pulled beside Pena's vehicle and parked. Two females exited the silver car. Two males exited Pena's vehicle, and Monroe did not see any other occupants at that time in Pena's vehicle. The two males who exited Pena's vehicle and the two females who exited the silver car went into the WalMart. About ten minutes later, those four individuals exited the WalMart together, returned

---

[2] The jury charge also contained instruction on the lesser included offense of possession of methamphetamine in an amount of more than four grams but less than 200 hundred grams.

to their cars, and drove away from the parking lot. When the silver car passed Monroe, he noted the "tag light" for illumination of the rear license plate was not functioning. This is a violation of the Texas Transportation Code, *see* TEX. TRANSP. CODE ANN. § 547.322(f) (West 2011),[3] for which a traffic stop lawfully could be conducted and a citation could be written. Monroe radioed fellow Denison police officer Troy Larouche, who was within two blocks of Monroe's location, and advised Larouche that a silver car without illumination of its rear license plate had left the WalMart parking lot.

Monroe drove from his location adjacent to the WalMart parking lot to a nearby Motel 6 where Pena's vehicle had been driven. Monroe testified that at the Motel 6, Pena gave consent for the search of his vehicle; no contraband was found in Pena's vehicle or on his person.

*Larouche's Testimony*

Larouche testified he was on patrol in the early morning hours of December 10, 2014. At about 1:30 a.m., he received a communication from Monroe that Monroe was following Pena's vehicle. Larouche knew Pena was an individual who distributed and sold illegal narcotics in Denison and the Grayson County area. Monroe advised Larouche of the location of Pena's vehicle and the silver car observed by Monroe in the WalMart parking lot. Larouche testified that from his location across the street, he had clearly seen Pena's vehicle and the silver car in the WalMart parking lot. When Pena's vehicle and the silver car were driven out of the WalMart parking lot, Monroe also advised Larouche of the direction the cars were traveling and that the

---

[3] Section 547.322(f) provides:

A taillamp or a separate lamp shall be constructed and mounted to emit a white light that:

    (1) illuminates the rear license plate; and
    (2) makes the plate clearly legible at a distance of 50 feet from the rear.

TEX. TRANSP. CODE ANN. § 547.322(f).

silver car's rear license plate was not illuminated. Larouche personally did not observe the traffic offense; however, upon receiving Monroe's information regarding the traffic violation, Larouche drove to the Motel 6 parking lot where Pena's vehicle and the silver car were then parked.

Larouche pulled behind the silver car as Dominy-Gatz was exiting the driver's side of the car. The passenger in Dominy-Gatz's car had not exited the car. Pena had parked his vehicle a few parking spaces away from where Dominy-Gatz had parked. Larouche saw two males who had exited Pena's car. Larouche believed the two men were there to meet with Dominy-Gatz. When the men saw Larouche, they walked in the opposite direction, and Larouche advised Monroe where the men were, at which point Monroe made contact with those men.

Larouche explained to Dominy-Gatz that he had stopped her because the rear license plate on her car[4] was not illuminated. Dominy-Gatz gave Larouche her name and date of birth and told him that the passenger in her car was her nineteen-year-old daughter, Chelsea. Because Larouche had observed Dominy-Gatz's car parked next to Pena's vehicle in the WalMart parking lot, he was suspicious there would be narcotics in her car. When asked about her location prior to driving to the Motel 6, Dominy-Gatz confirmed she had driven to the Motel 6 from the WalMart.

Approximately eight minutes after making the traffic stop, Larouche radioed dispatch requesting information on any outstanding arrest warrant for Dominy-Gatz or Chelsea. While speaking with Dominy-Gatz, Larouche went to the driver's door which Dominy-Gatz had left ajar when she exited the car. He saw in plain view an open alcoholic beverage container in Dominy-Gatz's car, and Chelsea stated it was hers. He also observed in plain view a "torch

---

[4] The silver car Dominy-Gatz was driving was registered to her father. That fact is not relevant to our analysis, and we will refer to the vehicle as Dominy-Gatz's car.

–4–

lighter" commonly used by individuals who smoke methamphetamine on the floorboard of the driver's side of the car. Located beside the torch lighter in plain view Larouche observed an eyeglass case. Protruding from the eyeglass case was the burnt bulb end of a glass pipe commonly used to smoke methamphetamine. Larouche had seen these types of pipes regularly in his police work dealing with individuals who smoke methamphetamine. Larouche testified that, in addition to the open alcoholic beverage container, the drug paraphernalia gave him probable cause to continue his investigation and to search the car. Larouche asked Chelsea to exit the car, and she complied. Larouche retrieved the torch lighter and eyeglass case from the car. He allowed Chelsea to reenter the car because it was cold outside and he wanted to speak with Dominy-Gatz outside Chelsea's presence. At approximately ten minutes after making the traffic stop, Larouche asked for vehicle registration information.

Larouche explained to Dominy-Gatz that he had observed the torch lighter and eyeglass case with what appeared to be a methamphetamine pipe protruding from the case. Larouche took the eyeglass case from the car and opened it. Larouche again requested that Chelsea exit the car, and he performed a search of Dominy-Gatz's car. While performing the search, he found a black nylon pouch in the right hip area of the driver's seat. Inside the black pouch, he found two glass pipes containing burnt residue, a large straw or "shovel" commonly used to scoop methamphetamine from a package, a plastic bag containing a crystalline substance, a plastic bag containing pills, and smaller plastic bags Larouche testified were used for packaging methamphetamine for sale. There were also feminine hygiene products in the black pouch which supported his belief the pouch belonged to Dominy-Gatz, and Larouche testified Dominy-Gatz had care, custody, and control of the eyeglass case and the black pouch found in her car.

While Larouche was searching Dominy-Gatz's car, her cell phone repeatedly rang indicating on the phone's screen that the caller was "Guido." Larouche testified Guido is an

individual in the Grayson County area known to distribute and sell methamphetamine and other narcotics. Larouche testified that Chelsea's cell phone also received calls from an individual identified on the phone's screen as "Guido."

Larouche testified he was "trying to work" with Dominy-Gatz and he wanted to help her. He stated that had Dominy-Gatz admitted there was methamphetamine in her car, he would have urged her to give him information as to who supplied the drugs in order to investigate "higher up the chain," a technique Larouche referred to as "flipping. Dominy-Gatz admitted she was going to meet Pena to purchase methamphetamine, but stated she had not purchased methamphetamine from him because she did not have any money. However, Larouche testified Dominy-Getz had over twenty dollars in her pocket which was enough to purchase methamphetamine. Larouche recalled Dominy-Gatz stating the items he found in her car could have been placed there by someone else.[5]

Larouche released Chelsea and Dominy-Gatz's car. Larouche arrested Dominy-Gatz and transported her to jail.

*Digital Recording from Larouche's Police Cruiser*

The jury viewed the digital recording made from the dashboard camera in Larouche's police cruiser. The recording showed Larouche's police cruiser pulling in behind Dominy-Gatz's parked car which Dominy-Gatz had exited. Larouche asked Dominy-Gatz for her driver's license, and she indicated she did not have it with her. She did provide Larouche her social security card. Dominy-Gatz provided her birthdate and indicated that the passenger in her car was her nineteen-year-old daughter, Chelsea. In response to questioning, Dominy-Gatz advised

---

[5] The reporter's record reflects Larouche stated Dominy-Gatz said "Mr. Hane could have put it in there." There is no other mention of an individual by the name of "Hane" in the record, and from the context, it appears this is a typographical error and should have read that Dominy-Gatz stated "Mr. Pena could have put it in there."

she had come from the WalMart store where she and Chelsea had seen a friend, Pena, and another friend who neither she nor Chelsea were able to identify by name.

Larouche asked to speak with Dominy-Gatz while Chelsea remained in Dominy-Gatz's car. Larouche told Dominy-Gatz that Pena sells methamphetamine and it appeared suspicious that she pulled into the WalMart parking lot immediately after Pena, she parked beside Pena's car, and they went into the WalMart store together for a short time. Dominy-Gatz stated Pena asked her and Chelsea to follow him to the Motel 6 in order to give Chelsea a jacket that belonged to their friend. Larouche indicated to Dominy-Gatz that he wanted to help her in any way he could and he wanted to work with her. Dominy-Gatz denied there was anything illegal in her car and told Larouche she did not want him to "go in" her car.

Larouche informed Dominy-Gatz he had pulled his police cruiser behind her car because her rear license plate was not illuminated. Chelsea confirmed she did have a Texas driver's license but stated she did not have it with her. Larouche then radioed to dispatch a request for information regarding Dominy-Gatz and Chelsea. After he received confirmation that there was not an outstanding warrant for the arrest of either Dominy-Gatz or Chelsea, Larouche approached Dominy-Gatz's car. The driver's door of the car remained open, and from outside the car Larouche saw an open alcoholic beverage container. Chelsea stated it belonged to her, and she exited the car at Larouche's request. At that point, Larouche stated that having seen the open container belonging to an under-aged passenger, he wanted to look inside, but was not searching, Dominy-Gatz's car. Larouche looked through the open driver's door. He then told Dominy-Gatz he had seen a torch lighter on the floorboard of the driver's side of the car, as well as an eyeglass case with the bowl end of a methamphetamine pipe protruding from it. Dominy-Gatz denied the item was a methamphetamine pipe and declined to retrieve the eyeglass case from the car. Larouche advised Dominy-Gatz he could see that the bowl of the pipe protruding

from the eyeglass case was burnt. Again, Dominy-Gatz denied it was a methamphetamine pipe and stated the eyeglass case was brand new.

Larouche stated he knew a methamphetamine pipe was protruding from the eyeglass case, and he had probable cause to search Dominy-Gatz's car. He repeatedly encouraged Dominy-Gatz to cooperate with him, and he stated he could write her a ticket for drug paraphernalia and she could drive away. Dominy-Gatz stated she would be cooperative. When asked if "that was all that was in the eyeglass case," Dominy-Gatz stated she did not know, despite it being on the floorboard of the driver's seat where she was sitting. She then stated there was not anything else in the eyeglass case other than a methamphetamine pipe. She stated Chelsea could not have placed the eyeglass case where it was found.

Larouche asked Chelsea to return to Dominy-Gatz's car while he spoke with Dominy-Gatz, and he instructed Chelsea not to touch anything in the car. In the discussion with Dominy-Gatz that followed, she denied she possessed any bags of methamphetamine. Larouche stated he knew she had gone to the WalMart store to meet Pena in order to purchase methamphetamine. Larouche indicated at that point that he intended to write Dominy-Gatz a ticket, was not going to arrest her, and was trying to work with her so she could go home with Chelsea. Dominy-Gatz continued to deny she possessed any methamphetamine or that she had gone to the WalMart store to meet Pena in order to obtain methamphetamine. She stated that Pena could have placed the methamphetamine pipe in her car a few minutes before. Dominy-Gatz agreed the eyeglass case was a female's case but stated males also carry them. She told Larouche that Pena had called her and she was supposed to meet him to purchase "a quarter" of methamphetamine, but she did not have the cash to purchase it. Pena told her he was staying at the Motel 6. Larouche stated Dominy-Gatz had been honest with him, and he was going to work with her and write her a ticket and she "will go home."

Larouche advised Dominy-Gatz that he was going to look through her car and that he had probable cause to do so. He again asked Chelsea to exit the car. Larouche found a black pouch in the driver's seat of the car. Dominy-Gatz stated the black pouch was not hers. On the recording, Larouche is seen taking items from the black pouch and identifying them as methamphetamine pipes, baggies containing residue, a scoop straw, and pills. Larouche provided *Miranda*[6] warnings to Dominy-Gatz at that point, and Dominy-Gatz verbally confirmed she understood those warnings. Dominy-Gatz stated she knew what came out of the black pouch was methamphetamine, but she did not know where it came from, and she stated Chelsea did not place the black pouch in the driver's seat.

Police sergeant Shane Kumler came to Dominy-Gatz's car from another location at the Motel 6 scene. Kumler was told by Larouche what had been found in Dominy-Gatz's car. After being asked by Kumler to weigh the contents of a baggie found in the black pouch, Larouche confirmed the weight as "7.8 with the bags." Larouche noted Dominy-Gatz was receiving calls from "Guido" on her cell phone.

*Chelsea's Testimony*

Chelsea testified she was nineteen years old on December 10, 2014. In the early morning hours, she had ridden in a car driven by her mother, Dominy-Gatz, to the WalMart store to meet her friend Pena. Chelsea had loaned Pena money and was meeting Pena for the purpose of being repaid. At the WalMart store, Dominy-Gatz parked next to Pena's vehicle. Dominy-Gatz, Chelsea, Pena, and another male traveling with Pena walked into the WalMart store. Chelsea stated Dominy-Gatz's car was not locked while they were in the WalMart. After entering the WalMart store, Chelsea did not see Pena again until she and Dominy-Gatz were exiting the store. Pena asked Dominy-Gatz and Chelsea to follow him to the Motel 6. Chelsea did not know the

---

[6] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

reason Pena wanted them to follow him to the Motel 6, but she thought that perhaps she would have the opportunity to get her money back from Pena at that location. There was no discussion of drugs.

At the Motel 6, Chelsea testified Dominy-Gatz did not get out of the car until she was asked to do so by Larouche. Larouche found an eyeglass case in Dominy-Gatz's car and instructed Chelsea to return to the car while he spoke with Dominy-Gatz. Chelsea testified she had driven Dominy-Gatz's car earlier that day, and she had not seen drugs in the car. She had never seen the eyeglass case or the methamphetamine glass pipe found in that case until after Larouche's traffic stop. She also testified the black pouch found during the search of Dominy-Gatz's car is not her bag and she had never seen it or its contents, and she had not placed those items in Dominy-Gatz's car.

*Kumler's Testimony*

Kumler, employed in the narcotics unit of the Denison Police Department and the supervisor of Monroe and Larouche, testified at trial. Kumler was aware of what Monroe and Larouche had observed in the WalMart parking lot. Kumler aided Monroe and Larouche in the investigation following Larouche's traffic stop of Dominy-Gatz's car. At the Motel 6 scene, he went "back and forth" between Larouche's interactions with Dominy-Gatz and Monroe's interactions with Pena.

Kumler testified that it is common for a person arrested on a narcotics charge to want to provide information leading to an investigation or arrest of individuals involved in the distribution of narcotics in order to obtain a reduction of sentence or dismissal of charges. Kumler expects seasoned police officers to obtain that type of information and to pass it along to assist other police officers in the narcotics unit. Kumler knew of Pena and Guido as distributors of methamphetamine. Pena's outer clothing and vehicle were searched at the Motel 6 scene,

–10–

however Kumler did not believe any charges were filed against Pena arising from the events of December 10, 2014. Kumler testified that it made sense to him that Dominy-Gatz's cell phone was being called repeatedly by Guido, because Kumler's information was that Guido was selling large quantities of methamphetamine, and Guido would want to stay in constant contact with anyone transporting methamphetamine for him.

Based on his experience as a narcotics officer, Kumler testified regarding methamphetamine use and the items recovered from Dominy-Gatz's car that were admitted into evidence. Kumler indicated methamphetamine is usually ingested by smoking using a glass pipe. Kumler identified three methamphetamine pipes burnt on the bottom that were recovered from Dominy-Gatz's car. According to Kumler, the forty-seven small baggies recovered from Dominy-Gatz's car are of a size commonly used for delivery of methamphetamine and high-grade marijuana. Those size baggies are usually utilized for sale of $20.00 or $40.00 worth of methamphetamine. A quarter of a gram, or $20.00 worth of methamphetamine, could result in someone being "high" for a period of between two to sixteen hours or a full day depending on the person's tolerance. Kumler also testified that the "dipping straw" recovered from Dominy-Gatz's car can be used to dip into a larger baggie of methamphetamine in order to fill a smaller baggie for sale to someone seeking to purchase $20.00 worth of the drug. Kumler identified a baggie recovered from Dominy-Gatz's car which held a quarter of an ounce of a crystalline substance containing methamphetamine or "crystal meth." Kumler believed someone possessing almost a quarter ounce of methamphetamine would be possessing it with the intent to distribute it and that it would not be an amount possessed for personal use.

Kumler identified the eyeglass case and the black pouch that were recovered from Dominy-Gatz's car.

–11–

*Hannah Sigal's Testimony*

Hannah Sigal, a forensic scientist employed by the Texas Department of Public Safety Crime Laboratory in Garland, Texas, testified concerning her testing of the crystalline substance seized from Dominy-Gatz's car. According to the testing, the substance weighed 6.88 grams and contained methamphetamine.

**Suppression of Evidence from Vehicle Stop**

In her first point of error, Dominy-Gatz asserts the trial court abused its discretion by denying her motion to suppress all evidence resulting from an illegal search of her vehicle because the warrantless search was conducted after an illegal traffic stop and an unlawful extension of that traffic stop.

*Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016). We review the trial court's factual findings for an abuse of discretion, but review the trial court's application of the law to the facts de novo. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We afford almost complete deference to the trial court's determination of historical facts, "especially if those are based on an assessment of credibility and demeanor." *Brodnex*, 485 S.W.3d at 436 (quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). We review mixed questions of law and fact that do not turn on credibility and demeanor as well as purely legal questions de novo. *Brodnex*, 485 S.W.3d at 436. Although the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony, *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010), we review de novo

"whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion of criminal activity." *Brodnex*, 485 S.W.3d at 437 (quoting *Crain*, 315 S.W.3d at 48–49).

When, as in this case, the trial court does not make explicit findings of fact and neither party timely requested findings of fact and conclusions of law from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those implied findings. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006); *see also Valtierra*, 310 S.W.3d at 447. We assume that the trial court resolved any issues of historical fact or credibility consistently with its ultimate ruling. *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010). We will reverse the trial court's ruling "only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex Crim. App. 2006)). We afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Story*, 445 S.W.3d at 732; *see also State v. Copeland*, No. PD-1549-15, 2016 WL 5952000, at \*2 (Tex. Crim. App. Oct. 12, 2016) (when reviewing trial court's ruling on motion to suppress, appellate court upholds the ruling if it is correct under any theory of law applicable to the case, even if trial court did not rely on that theory in making its ruling).

*Detention for Traffic Violation*

The Fourth Amendment to the United States Constitution provides protection against unreasonable searches and seizures by government officials. U.S. CONST. amend. IV.[7] A defendant asserting a search violates the Fourth Amendment bears the burden of producing evidence to rebut the presumption of proper conduct by law enforcement. *State v. Woodward*, 341 S.W.3d 404, 412 (Tex. Crim. App. 2011). The defendant can satisfy this burden with evidence that the seizure occurred without a warrant. *Id.* If the defendant satisfies the initial burden, the burden then shifts to the State to establish that the seizure was nevertheless reasonable under the applicable standard—either reasonable suspicion or probable cause. *Id.*

An officer may lawfully stop and reasonably detain a motorist if the officer has a reasonable basis for suspecting the person has committed a traffic violation. *Garcia v. State*, 827 S.W.2d 937, 944–45 (Tex. Crim. App. 1992); *State v. Gammill*, 442 S.W.3d 538, 540 (Tex. App.—Dallas 2014, pet. ref'd); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).[8] Routine traffic stops are more analogous to investigative detentions than custodial arrests and are thus analyzed as so-called "*Terry* stops." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). An investigative detention—either as part of, or apart from, a traffic stop—is a seizure for Fourth Amendment purposes. *See Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996). Therefore, a traffic stop and any concomitant investigative detention must be reasonable under the United States and Texas constitutions. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. In order to carry its burden, the State does not have to establish with absolute certainty that a traffic violation occurred. *Abney v. State*, 394 S.W.3d

---

[7] The Fourth Amendment exclusionary rule is made applicable to the states through the due process clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 650–51, 655 (1976); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

[8] *See also Aguilar v. State*, No. 05-15-00535, 2016 WL 1725481, at *2 (Tex. App.—Dallas Apr. 27, 2016, no pet. ) (police officer may lawfully stop and reasonably detain person for traffic violation).

542, 548 (Tex. Crim. App. 2013). Rather, the State must establish that, under the totality of the circumstances, the detention was reasonable. *Id.*; *Gammill*, 442 S.W.3d at 543. To determine the reasonableness of an investigative detention, we conduct the inquiry set forth in *Terry*: (1) whether the officer's action was justified at its inception; and (2) whether it was reasonably related in scope to the circumstances that initially justified the interference. *Terry*, 392 U.S. at 19–20; *Davis v. State*, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997).

A police officer has reasonable suspicion to detain if he has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Brodnex*, 485 S.W.3d at 437; *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). "This is an objective standard that disregards the subjective intent of the officer and requires only some minimal level of justification for the stop." *Brodnex*, 485 S.W.3d at 437. "However, the officer must have more than an inarticulable hunch or mere good-faith suspicion that a crime was in progress." *Id.*; *Crain*, 315 S.W.3d at 52. A reasonable suspicion determination is made by considering the totality of the circumstances. *Brodnex*, 485 S.W.3d at 437.

In this case, Monroe was observing Pena's vehicle and a silver car occupied by two females—Dominy-Gatz's car—in the WalMart parking lot. Larouche, who was parked one to two blocks away, was aware of Monroe's surveillance of the WalMart parking lot. When Dominy–Gatz's car exited the WalMart parking lot, Monroe observed it had an unilluminated rear license plate, a violation of the transportation code, and Monroe communicated that information and the direction Dominy-Gatz's was traveling to Larouche. Larouche followed Dominy-Gatz's car to the Motel 6 and conducted a traffic stop of that car, which was parked in close proximity to Pena's vehicle.

Dominy-Gatz argues that information provided to Larouche regarding the unilluminated rear license plate on the silver car was insufficient for Larouche to have reasonable suspicion to conduct a traffic stop of Dominy-Gatz's car. However, "[t]he factual basis for stopping a vehicle need not arise from the officer's personal observation, but may be supplied by information acquired from another person." *Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)); *see Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003). Relying on information from a reliable source, his fellow police officer Monroe, Larouche had a reasonable basis for conducting a traffic stop of Dominy-Gatz's car. Larouche had a reasonable suspicion based on specific, articulable facts, combined with rational inferences from those facts, that Dominy-Gatz operated a car in violation of the transportation code. *See Garcia*, 827 S.W.2d at 944–45 (police officer may initiate traffic stop if he has reasonable basis for suspecting motorist has committed traffic violation); *Brother*, 166 S.W.3d at 258 (factual basis for stopping vehicle may be supplied by information acquired from another person). The record, viewed in the light most favorable to the trial court's ruling, supports a finding that the traffic stop was based on reasonable suspicion and supports the trial court's denial of Dominy-Gatz's motion to suppress evidence obtained following the traffic stop.

*Length of Detention*

Dominy-Gatz argues the investigative detention following the traffic stop was "not temporary," "lasted longer than necessary to effectuate the purpose of the traffic stop," and Larouche "did not develop further justification to extend the traffic stop." The State responds that while speaking with Dominy-Gatz and awaiting a response to his radio request for information on any outstanding arrest warrant for Dominy-Gatz or Chelsea, Larouche observed drug paraphernalia in the car as well as an open container of alcoholic beverage which the under-aged passenger stated was hers, and therefore continued investigative detention was justified.

–16–

The length of detention of a motorist during a traffic stop must be reasonable in relation to the officer's investigation; at some point, a detention may become too long in duration to be justified as an investigative stop. *See United States v. Sharpe*, 470 U.S. 675, 683–88 (1985). There is no bright line rule as to how long a traffic stop may reasonably continue; instead, courts consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which it was necessary to detain the defendant." *Id.* at 686; *see United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc) ("There is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'") (quoting *Sharpe*, 470 U.S. at 686); *see also Kothe v. State*, 152 S.W.3d 54, 65 n.42 (Tex. Crim. App. 2004) (quoting *Brigham* for same).

"Reasonableness" under the Fourth Amendment is determined by balancing the public interest served against the individual's right to be free from arbitrary detentions and intrusions, and courts therefore consider the legitimate law enforcement purposes served by asserted delays in an officer's investigative detention as well as the time reasonably needed to effectuate those purposes. *See Sharpe*, 470 U.S. at 685; *see also Kothe*, 152 S.W.3d at 63. During a traffic stop, an officer may request information such as a driver's license and vehicle registration, and may conduct a computer check of that information. *Kothe*, 152 S.W.3d at 63. An officer may also request the driver's destination and the purpose of the trip. *Johnson v. State*, 323 S.W.3d 561, 563 (Tex. App.—Eastland 2010, pet. ref'd). While the officer is awaiting a computer warrant check, questioning about matters unrelated to the initial traffic stop does not violate the Fourth Amendment because such questioning does not extend the duration of an initial valid stop. *Id.* Nevertheless, once the reason for the traffic stop has been satisfied, the detention may not be

used as a "fishing expedition for unrelated criminal activity." *Davis*, 947 S.W.2d at 243. The traffic-stop investigation is fully resolved only after police make the determination that the driver has a currently valid license and no outstanding warrants and the car is not stolen. *Kothe*, 152 S.W.3d at 63–64. However, once a peace officer concludes the investigation of the conduct that initiated the traffic stop, continued detention of a person is permitted if the officer has reasonable suspicion to believe another offense has been or is being committed. *See St. George v. State*, 197 S.W.3d 806, 817 (Tex. App.—Fort Worth 2006) ("But if reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled."), *aff'd*, 237 S.W.3d 720, 721 (Tex. Cim. App. 2007).[9]

At the hearing of the motion to suppress, the trial court heard evidence that after stopping his police cruiser behind Dominy-Gatz's car, Larouche approached Dominy-Gatz who was standing beside her car. Larouche requested identification documentation from Dominy-Gatz and explained the traffic stop was based on an unilluminated rear license plate on Dominy-Gatz's car. After unsuccessfully looking for her driver's license, Dominy-Gatz gave Larouche her social security card. Dominey-Gatz indicated the passenger in her car was her nineteen-year-old daughter, Chelsea. In response to questioning by Larouche, Dominy-Gatz indicated she had come to the Motel 6 from the WalMart store where she and Chelsea had met Pena and another man. Larouche asked whether Dominy-Gatz had ever had a problem with narcotics, and she stated that in the past she had. Larouche stated to Dominy-Gatz that Pena sells methamphetamine and that it looked suspicious that Dominy-Gatz pulled next to Pena in the WalMart parking lot and she then followed Pena's vehicle to the Motel 6. Dominy-Gatz denied

---

[9] *See also Holmquist v. State*, 05-13-01388-CR, 2015 WL 500809, at \*3 (Tex. App.—Dallas Feb. 5, 2015, pet. ref'd) (not designated for publication) (where initial detention is based on traffic violation, various combinations of factors will support reasonable suspicion of criminal activity sufficient to justify continued detention or further questioning unrelated to traffic violation).

she had anything illegal in her car but did not want Larouche to look inside her vehicle. Larouche asked Chelsea for her driver's license, but she was unable to produce it. At that point, Larouche radioed dispatch requesting information on Dominy-Gatz and Chelsea. This was approximately eight minutes into the traffic stop.

Larouche walked back from his police cruiser and looked inside the open driver's door of Dominy-Gatz's car. At about ten minutes into the traffic stop, Larouche saw in plain view an open alcoholic beverage container which the under-aged passenger stated was hers. At about twelve minutes into the traffic stop, Larouche saw in plain view on the floorboard by the driver's seat a torch lighter and an eyeglass case with the bulb of a methamphetamine pipe protruding. Larouche testified he felt at that point he had probable cause to search Dominy-Gatz's car. Larouche returned to his police cruiser and, at approximately fourteen minutes into the traffic stop, made a second radio contact with dispatch and was informed there were no outstanding arrest warrants for Dominy-Gatz or Chelsea. Larouche testified that Dominy-Gatz was at that point detained for further investigation.

In *Hamal v. State*, 390 S.W.3d 302 (Tex. Crim. App. 2012), the defendant's car was stopped for traveling seventy-nine miles per hour in a sixty-five mile-per-hour zone. When the officer approached the defendant's car, he notice the defendant was nervous, her hands were shaking, and she was looking down into a purse or bag. *Id*. at 304. After asking the defendant to get out of the car, the officer asked her several questions, including whether she had ever been in trouble. The defendant answered, "no." *Id*. The officer then told the defendant he was going to issue her a citation for speeding. *Id*.

The officer returned to his patrol car and called dispatch to check on the defendant's criminal history. *Id*. He learned the defendant had nine arrests, including four arrests for possession of a controlled substance, with the most recent arrest being seven months prior to the

stop. *Id*. The officer requested the defendant's permission to search her car, but she refused. *Id*. The officer then called for a drug dog and told the defendant he was doing so because she seemed nervous and had lied to him. *Id*. The drug dog arrived and alerted on the defendant's car. *Id*. at 305. A search of the car revealed a canister containing a glass pipe and methamphetamine. *Id*. The trial court denied the defendant's motion to suppress the evidence seized from her car. *Id*.

Like Dominy-Gatz argued in support of her motion to suppress here, the defendant in *Hamal* argued on appeal that the officer had sufficient time to effectuate the purpose of the traffic stop and the officer did not have reasonable suspicion to support prolonging the detention. *Id*. at 307. The court of criminal appeals affirmed the trial court's ruling, noting the officer had the following information that, when viewed as a whole, was sufficient to establish reasonable suspicion: (1) the defendant was traveling late at night; (2) she had exceeded the speed limit; (3) she was nervous, with hands shaking; (4) she had a prior criminal record; (5) this record included arrests for drug offenses; (6) one of the drug arrests was recent; and (7) she responded, "no," when asked whether she had ever been in trouble before. *Id*. at 308.

At about 1:30 a.m., Dominy-Gatz parked her car next to a known methamphetamine dealer's vehicle in a WalMart parking lot, entered the store with the drug dealer, and then followed the drug dealer's vehicle to the Motel 6. Dominy-Gatz was stopped by Larouche at the Motel 6 for an unilluminated rear license plate. Dominy-Gatz confirmed to Larouche that she "had a problem" with narcotics in the past. In the course of the traffic stop investigation and before it had been fully resolved, Larouche observed in plain view an open alcoholic beverage in Dominy-Gatz's car; he learned the alcoholic beverage belonged to the under-aged passenger; he also observed in plain view drug paraphernalia on the floorboard of the driver's side of the car. On this record, Larouche had a reasonable suspicion that an offense in addition to the

unilluminated rear license plate had been or was being committed. *See Gammill*, 442 S.W.3d at 540. Larouche's reasonable suspicion arose in the course of and before the purpose of the traffic stop had been completed, justifying continued investigative detention of Dominy-Gatz. *See St. George*, 197 S.W.3d at 817; *see also Hamal*, 390 S.W.3d at 308; *Sharpe*, 470 at 688 (rejecting contention that twenty-minute stop was unreasonable when police had acted diligently and suspect's actions contributed to added delay about which he complained); *Love v. State*, 252 S.W.3d 684, 688 (Tex. App.—Texarkana 2008, pet. ref'd) (first twenty-five minutes of forty-five minute time interval between initial stop and search of vehicle was not unreasonable where that period consisted of initial stop, questioning of defendant, radio confirmation of information given by defendant, second questioning of defendant concerning inconsistencies which confirmation raised, and request to permit a search of defendant's vehicle; as result of information gleaned during the twenty-five minute period of time, police officer acquired articulable facts that, when combined with rational inferences from those facts, led officer to have reasonable belief defendant was actually engaged in criminal activity); *Smith v. State*, 789 S.W.2d 350, 353 (Tex. App.—Amarillo 1990, pet. ref'd) (twenty minutes held reasonable for all legitimate components of traffic stop to have been completed).

We conclude the police did not illegally extend Dominy-Gatz's detention because reasonable suspicion that Dominy-Gatz was engaged in criminal activity arose in the course of the traffic stop and before the traffic stop investigation was fully resolved. Prior to completion of the traffic stop investigation, Larouche had developed specific articulable facts, which taken together with rational inferences from those facts, led him to conclude Dominy-Gatz was, had been, or soon would be engaged in criminal activity. *See Balentine v. State*, 71 S.W.3d 763, 769 (Tex. Crim. App. 2002). Viewing the evidence in the light most favorable to the trial court's ruling, and looking at the totality of the circumstances while giving almost total deference to the

trial court's determination of historical facts, we conclude the trial court did not err by finding these facts gave rise to reasonable suspicion sufficient to justify Larouche's detention of Dominy-Gatz in order to continue his investigation.[10]

We resolve Dominy-Gatz's first point of error against her.

## Suppression of Dominy-Gatz's Statements

In her second point of error, Dominy-Gatz contends the trial court erred in denying her motion to suppress evidence of her statements made to a law enforcement officer prior and subsequent to being given *Miranda* warnings.[11]

### *Statements Made Prior to Warnings*

Dominy-Gatz asserts statements she made to Larouche that she intended to buy methamphetamine from Pena but she did not have enough money to purchase it, and that the eyeglass case from which Larouche saw a methamphetamine pipe protruding was a brand new case, should have been suppressed by the trial court. Dominy-Gatz argues those statements were the result of a custodial interrogation prior to receiving her *Miranda* warnings, and the trial court erred in failing to suppress those pre-warning statements. The State responds that Larouche, while speaking with Dominy-Gatz, had detained but not arrested her. Dominy-Gatz was not handcuffed, placed in Larouche's police car, placed in custody, or taken to jail prior to her arrest and provision of *Miranda* warnings, and thus her statements did not stem from a custodial interrogation and were given to the officer freely, voluntarily, and without compulsion or persuasion.

---

[10] *See Kimbell v. State*, No. 05-11-01211-CR, 2013 WL 4568049, at *5, 6 (Tex. App.—Dallas Aug. 26, 2013, pet. ref'd) (not designated for publication) (seventeen minutes into traffic stop, police officer told defendant she was "clear" and he was not going to arrest her for any traffic violations; at that point, purpose of traffic stop had been effectuated, however, during traffic stop, officer had observed defendant was nervous, shaky, and chatty, and confirmed defendant had been previously arrested for drug offense and was living with known methamphetamine user; trial court did not err by finding those factors gave rise to reasonable suspicion sufficient to justify six-minute detention to conduct canine sniff on defendant's car).

[11] *See Miranda*, 384 U.S. 436.

The Fifth Amendment affords a person the right to be free from compelled self-incrimination. U.S. CONST. amend. V; *Herrera v. State*, 241 S.W.3d 520, 525–26 (Tex. Crim. App. 2007).[12] To protect this right, the individual must be warned of his constitutional and statutory rights prior to custodial interrogation. *Miranda*, 384 U.S. at 444–45; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§(2) & 3(a)(2) (West Supp. 2016); *Herrera*, 241 S.W.3d at 525. Custodial interrogation consists of questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444; *Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009) (appropriate inquiry for determination of custody is whether individual was formally arrested or had freedom of movement restrained to degree associated with formal arrest). A defendant must generally be in custody before *Miranda* rights are triggered. *See Miranda*, 384 U.S. at 444, 478–79 (requirement that police advise person of rights prior to questioning applies if the person has been taken into custody or otherwise deprived of his freedom of action in any significant way); *Herrera*, 241 S.W.3d at 525–26. A person held for investigative detention is not in custody. *Bates v. State*, 494 S.W.3d 256, 277 n.25 (Tex. App.—Texarkana 2015, pet. ref'd).[13] "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)). The "reasonable person" standard presupposes an innocent person. *Id*. At least four general situations may constitute custody for purposes of *Miranda*: (1) the suspect is physically deprived of his freedom of action in any

---

[12] The Fifth Amendment guarantee against self-incrimination was made applicable to the states through the due process clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

[13] *See also Caballero v. State*, No. 05-11-00367-CR, 2012 WL 6035259, at *5 (Tex. App.—Dallas Dec. 5, 2012, pet. ref'd) (not designated for publication) (person held for investigative detention is not in "custody").

significant way, (2) a law enforcement officer tells the suspect that she cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted, and (4) there is probable cause to arrest and law enforcement officers do not tell the suspect that she is free to leave. *Gardner*, 306 S.W.3d at 294; *Dowthitt*, 931 S.W.2d at 255.

The determination of whether a person is in custody is made on an ad hoc basis considering all the objective circumstances. *Herrera*, 241 S.W.3d at 532; *see also Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010). We consider whether, given the circumstances, a reasonable person would believe she could not terminate the questioning and leave. *Herrera*, 241 S.W.3d at 532. The record as a whole must "clearly establish" the statement was the product of custodial interrogation, *id.* at 526 (quoting *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005), and the defendant bears the initial burden of proving a statement was the product of custodial interrogation. *Gardner*, 306 S.W.3d at 294.

Larouche conducted a stop of Dominy-Gatz's car for a traffic violation. While he did pull his police cruiser behind Dominy-Gatz's car which she had just parked in the Motel 6 parking lot, there is no evidence his police cruiser was placed in that location in order to prevent Dominy-Gatz from leaving or as an indication that she was not free to leave once the traffic stop had been completed. Larouche was suspicious of Dominy-Gatz following a known drug dealer from the WalMart parking lot where she had met him and questioned Dominy-Gatz regarding those circumstances. Larouche saw drug paraphernalia in plain sight on the floorboard of the driver's side of the car as well as an open alcoholic beverage container. What Larouche had observed warranted the continued detention of Dominy-Gatz to investigate additional criminal activity. Dominy-Gatz argues that because Larouche did not tell her she was free to leave, her interrogation was custodial. However, Larouche continually advised Dominy-Gatz that he only

–24–

intended to write her a ticket and did not intend to arrest her unless she was in possession of drugs. Having been advised that the peace officer intended to issue a citation, a reasonable, innocent person would not have believed her freedom of movement had been restricted in any significant way or that she was not free to leave after receiving a ticket. Dominy-Gatz argues that although Larouche did not affirmatively state she could not leave, he did tell her to "stay right there." However, that was a direction to her that he did not want her at that point in his investigation of the traffic violation to return to her car.

The circumstances surrounding the questioning of Dominy-Gatz by Larouche prior to her receiving *Miranda* warnings objectively demonstrate that a reasonable, innocent person would not have considered her freedom of movement restrained to the degree associated with a formal arrest. *See Dowthitt*, 931 S.W.2d at 255. Viewing the record in the light most favorable to the trial court's ruling, Dominy-Gatz was not in custody at the time she made the statements she claims should have been suppressed.

*Statements Made Subsequent to Warnings*

After Dominy-Gatz received *Miranda* warnings from Larouche, she went out of camera and audio recording range with Kumler for a period of approximately sixteen minutes. Dominy-Gatz then returned to the area in front of Larouche's police cruiser and the recording again captured what Dominy-Gatz said from the microphone on the shoulder of Larouche's police uniform, as preserved on the digital recorder in Larounche's police car. After being placed under arrest, Dominy-Gatz stated Pena knew he was being followed by the police and wanted to put something in Dominy-Gatz's car. Dominy-Gatz complains the trial court erred by failing to suppress this post-*Miranda*-statement.

According to Dominy-Gatz, the incriminating statement occurred after a break in the recording and should be suppressed under section 3(a) of article 38.22 of the code of criminal

procedure. Under section 3(a) of article 38.22, no oral statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless "an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;" prior to the statement but during the recording the accused is provided required warnings and the accused "knowingly, intelligently, and voluntarily waives any rights" set out in the warnings; and "the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(1), (2), & (3).

Dominy-Gatz asserts that after returning from speaking with Kumler, she did not again receive *Miranda* warnings "before eventually continuing the recording," in purported violation of section 3(a)(2) of article 38.22. However, the recorded statements made by Dominy-Gatz after returning from speaking with Kumler occurred during a continuing custodial interrogation after receiving *Miranda* warnings, and the relatively brief break in the recording did not require she receive additional *Miranda* warnings. *See Franks v. State*, 712 S.W.2d 858, 861 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (second phase of interrogation was merely a continuation of interrogation process and there was not such a "break" in the interrogation as to require the giving of new *Miranda* warnings); *see also Dunn v. State*, 721 S.W.2d 325, 338 (Tex. Crim. App. 1986) ("rewarning is not required where the interrogation is only a continuation about the same offense"), *abrogated on other grounds by Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). There is no evidence that Larouche "acted so as to dilute the efficacy of the warning" previously given. *See United States v. Hopkins*, 433 F.2d 1041, 1045 (5th Cir. 1970) (no evidence Dallas police, either prior to or following federal interrogation, acted so as to dilute efficacy of warning given by federal agent).

Dominy-Gatz further argues that her statements made after the break in the recording should be suppressed because, by not assuring she remained at all times within range of the recording device, Larouche did not competently operate the recording device in compliance with section 3(a)(3) of article 38.22. From the time the digital recorder was activated, it recorded uninterrupted through the time Dominy-Gatz was placed in the back seat of Larouche's police car[14]; Dominy-Gatz's short encounter with Kumler was not recorded because she was outside the viewing range of the camera and the microphone on the shoulder of Larouche's uniform. There is no evidence Larouche was not competent to operate the digital recording device in the front of his police cruiser or the microphone located on the shoulder of his uniform or that the recording devices did not operate properly. We are unpersuaded by Dominy-Gatz's argument that her statements subsequent to speaking off-camera with Kumler should be suppressed because Larouche incompetently operated the recording devices.

Under these circumstances, and viewing the evidence in the light most favorable to the trial court's ruling, we conclude the trial court did not abuse its discretion by denying Dominy-Gatz's motion to suppress her statements made after she received *Miranda* warnings.

We resolve Dominy-Gatz's second point of error against her.

### Sufficiency of the Evidence

In her third point of error, Dominy-Gatz argues there was insufficient evidence to support her conviction for the offense of possession with intent to deliver methamphetamine. More specifically, she asserts the evidence was legally insufficient to show she knowingly possessed the methamphetamine. The State responds sufficient evidence was presented at trial to prove she possessed the black pouch that contained the methamphetamine.

---

[14] After Dominy-Gatz was under arrest and seated in the back seat of Larouche's police car, a camera and audio microphone in the vehicle recorded Dominy-Gatz's conduct and statements.

*Standard of Review*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Fernandez v . State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Fernandez*, 479 S.W.3d at 837–38. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The factfinder is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the factfinder's determinations of credibility, and may not substitute our judgment for that of the factfinder. *Jackson*, 443 U.S. at 319; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). When there is conflicting evidence, we must presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative

force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903. A verdict of guilt will be upheld if the evidence is sufficient on any one of the theories submitted. *See Hooper*, 214 S.W.3d at 14.

*Discussion*

"Possession" is defined in the penal code as "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp. 2016). In a possession-of-a-controlled-substance prosecution, the State must prove that "(1) the accused exercised control, management, or care over the substance and (2) the accused knew that the matter possessed was contraband." *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). Mere presence at the location where drugs are found is insufficient, by itself, to establish actual care, custody, or control of those drugs. *Id.* at 162. "However, presence or proximity, when combined with other evidence, either direct or circumstantial (e.g., 'links'), may well be sufficient to establish that element beyond a reasonable doubt." *Id.* Some relevant factors that may affirmatively link an accused to contraband include:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Olivarez v. State*, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also Evans*, 202 S.W.3d at 162 n.12 (citing the possible "affirmative links" as factors which may circumstantially establish the legal sufficiency of the evidence to prove a knowing "possession"). The number of linking factors present is not as important as the "logical force" the factors have

–29–

in establishing the elements of the offense. *Gilbert v. State*, 874 S.W.2d 290, 298 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

The jury heard evidence of numerous affirmative links which could circumstantially establish Dominy-Gatz possessed methamphetamine. Drug paraphernalia was seen by Larouche in plain view on the floorboard of the driver's side of the car that Dominy-Gatz drove and had just exited. The eyeglass case from which that drug paraphernalia was protruding was a female's eyeglass case, and Dominy-Gatz stated it was a "brand new" eyeglass case, indicating to Larouche it must belong to her. The black pouch containing methamphetamine and drug paraphernalia was seen by Larouche in plain view in the driver's seat of Dominy-Gatz's car. The jury heard Dominy-Gatz's incriminating statements that she had met Pena to purchase methamphetamine. Although she stated she had not purchased methamphetamine from Pena because she did not have enough money, she did, in fact, have in her possession enough money to purchase methamphetamine.

Dominy-Gatz argues Chelsea had been left in the car alone prior to the time the black pouch was found, thus raising a question as to whether the methamphetamine was actually in Chelsea's possession. However, the jury heard Dominy-Gatz's statement on the digital recording that Chelsea did not place the black pouch in the driver's seat. The jury also heard Chelsea's testimony that she had never seen the eyeglass case or the methamphetamine glass pipe found in that case or the black pouch or its contents, and she had not placed those items in Dominy-Gatz's car.

The jury was entitled to believe this evidence in reaching its conclusion beyond a reasonable doubt that Dominy-Gatz knowingly possessed the methamphetamine found in the black pouch. Viewing the evidence in the light most favorable to the verdict, we conclude a rational juror reasonably could find, based on all the evidence and the inferences that can be

drawn from the evidence, that Dominy-Gatz knowingly possessed methamphetamine with the intent to deliver the methamphetamine. *See Jackson*, 443 U.S. at 319; *Wise*, 364 S.W.3d at 903. Accordingly, we resolve Dominy-Gatz's third point of error against her.

## Judgment Modification

Where the record provides the necessary information to correct inaccuracies in a trial court's judgment, we have the authority to reform the judgment to speak the truth. TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). Our review of the record confirms Dominy-Gatz pleaded true to the enhancement paragraph contained in the indictment, and the trial court found the enhancement paragraph to be true. Accordingly, we modify the judgment to reflect "true" to "Plea to 1st Enhancement Paragraph," and "true" to "Findings on 1st Enhancement Paragraph."

## Conclusion

The judgment of the trial court is modified to reflect Dominy-Gatz pleaded true to the enhancement paragraph contained in the indictment, and the trial court found the enhancement paragraph to be true. As modified, the judgment is affirmed.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

151194F.U05

–31–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

KELLIE LYNN DOMINY-GATZ,
Appellant

No. 05-15-01194-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial District
Court, Grayson County, Texas,
Trial Court Cause No. 065333.
Opinion delivered by Justice Fillmore,
Justices Brown and O'Neill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to reflect Kelly Lynn Dominy-Gatz pleaded "true" to the enhancement paragraph in the indictment and to reflect the trial court found the enhancement paragraph "true."  As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 16th day of December, 2016.